(22 Misc. Rep. 415.)

### In re ROHE'S WILL.

(Surrogate's Court, Erie County. January, 1898.)

1. WILLS—VALIDITY—UNDUE INFLUENCE—EVIDENCE.
Evidence that a certain devisee, who had been the executor of the will of testatrix's husband, and had frequently consulted with testatrix, attended to much of her business, and was named by her as the executor of her will, was insufficient to prove that her will was the result of undue influence on the part of such devisee, where it also appeared that testatrix had a will of her own, and that her own ideas prevailed in direct opposition to his wishes, and the bulk of her property was devised to another, who had been reared by her and her husband, and almost all the remainder thereof was devised to relatives.

2. SAME—BURDEN OF PROOF.
The burden of proving that a will was free from fraud and undue influence was not cast on an executor because of a devise to him.

3. SAME—CONFIDENTIAL RELATIONS—PRESUMPTIONS.
The existence of confidential relations, not of a fiduciary character, between testatrix and a devisee, raised no presumption of undue influence.

4. SAME—RELIGIOUS BELIEF.
In order to avoid a will on account of testatrix's belief in Spiritualism, it must be shown that such will was the offspring of such belief.

Proceedings, on the probate of the will and codicil of Mary E. Rohe, deceased, to determine the validity thereof.

Geo. Clinton, for proponents and executor.
Bissell, Carey & Cook and Tabor & Wilkie, for contestants.
Henry W. Hill, special guardian, for infant contestant.

MARCUS, S. The testimony offered by the contestants leaves for the determination of the court the sanity of the testatrix; also, whether undue influence was practiced upon her. The will and codicil of Mary E. Rohe, which are the subject of this contest, were made on the 9th of August, 1888, and the 16th of January, 1894, respectively. She was of the age of 73 years at the time of making the will, and of the age of 79 years when she executed the codicil. Her only relatives were nephews and nieces,—14 in all. In her will and codicil 10 were mentioned to a larger or smaller extent, and 4 were omitted therefrom.

At the outset I shall dispose of the question of sanity, by saying that the evidence adduced has failed to satisfy my mind that the testatrix was insane. It would not be useful to consider in detail the evidence given by the contestants, further than to say that while, perhaps, impaired mental and physical power might be reasonably concluded, it has failed to satisfy me of the want of testamentary capacity.

The evidence regarding undue influence is more troublesome, and I confess approaching this branch of the case with some diffidence,

recognizing, as I do, how different views may readily be taken by different minds from the evidence in this case. It has been uniformly held by our courts that there is no presumption against a will because made by a person of advanced age, nor that insanity can be inferred from an enfeebled condition of mind or body, providing the will is the free act of the testator, and he has sufficient intelligence to comprehend the condition of his property and the scope, meaning, and effect of the provisions of his will. It has likewise been uniformly held that the burden of making out a charge of undue influence rests on the parties alleging the same; that it cannot be presumed, but must be proved. The only exception is in the case of a person whose relations with deceased were such that he is presumed to have control over the judgment and will of the testator. The contestants have proceeded on this theory, and rely upon the conclusion that the evidence proved that Martin J. Nieman (a beneficiary under the will and codicil) occupied towards the testatrix a position of confidence and influence, and against him is made the charge that the will represents his mind and not that of the testatrix, that she was wholly dependent upon him for all knowledge and action in reference to her property, that he had been imposed upon her by her husband and her husband's will, that he had charge of the real estate and the collection of her rents, and that he dictated the amount of money she should have and the manner of its use; in short, that he was ever present, that his presence was a constant menace to her, and that, believing it would be impossible for him to sustain a will which would give to him all of the property of the testatrix, he wisely brought into the conspiracy Peter Geyer, who was made to be the ostensible devisee of nearly all of her property, and made himself executor and residuary legatee.

In the will of Peter Rohe (the husband of testatrix) Nieman was named as executor, and performed the duties of that office. He consulted with the deceased frequently, and attended to much of her business on the matters of insurance, taxes, and the affairs of the Main street property. I do not discover any evidence that undue, illegal, or improper influence was used upon the mind of the testatrix at the time of the making of this testament, nor at any other time. Evidence must be given of some act of persuasion, solicitation, or controlling power of mind, will, or judgment, whereby the testatrix was forced or induced to dispose of her estate in a manner different from that which she would have elected had she been a free agent. The evidence not only does not disclose that he had any influence over her, but, on the contrary, indicates that the testatrix had a will of her own, and that her own ideas prevailed in direct opposition to Nieman's wishes. The only evidence given on this point shows that Nieman asked the testatrix to give to him her Main street property, which she refused, and in speaking of the incident to one of her friends remarked that "she was not such a fool." There is no suspicion of undue influence to be taken from the fact that Nieman is a devisee. The great bulk of the property goes to a nephew,—Peter Geyer,—who was reared by the testatrix and her husband, who was a special favorite, while almost all the remaining

property goes to the relatives of the testatrix, and of her deceased husband.

The evidence would hardly warrant holding that the testatrix was dependent upon and subject to the control of Nieman, to the extent of invoking the principle of law that the burden is cast upon him of relieving himself of the suspicion, and showing either by direct proof or circumstances that the transaction was free from fraud or undue influence, but that the testatrix acted without restraint or coercion, because of his devise. Nor do I think, taking all the circumstances together, a case was made which required explanation that the will expressed the intention of the testatrix. There is nothing that appeals to my mind as unjust or eccentric about the provisions of this will; nor do I think the relations existing between Nieman and the testatrix, as shown by the testimony, raise any presumption of undue influence. The most that can be said of it, perhaps, is that the relation was confidential, but was not fiduciary in the ordinary sense, and the evidence does not show that the testatrix was in Nieman's power or control, or that the relation existing between them could be construed as raising any presumption of undue influence. The bequest of the bulk of the property of the testatrix to Peter Geyer does not impress me as a part of any conspiracy. By the codicil the will was changed so as to give Peter Geyer a fee in the Main street property, instead of a life estate, with remainder to his children. He was brought up by Mr. and Mrs. Rohe. He was their son in the affection of a childless couple. If motive were at all necessary for a court to comprehend, it would be satisfied by this disposition, and be able to understand the feeling which prompted it. It is not sufficient to establish that a person has the power unduly to overbear the will of the testator. It is necessary also to prove that in the particular case it was exercised, and that it was by means of the exercise of that power that the will, such as it is, has been produced.

The testimony offered by the contestants relating to the Spiritualistic séances, when closely analyzed, seems to show nothing but the fact that the testatrix was a believer in Spiritism. There is an entire absence of testimony as to the influence of Spiritism upon the particular disposition of her property as made by her. It must be conceded that the evidence proves conclusively that the testatrix was a believer in Spiritism, but it in no way shows that her visits among the people with whom she came in contact at the times the séances were held, or the messages received by her from interested or disinterested persons, affected by the same belief, in any way induced her to make any disposition of her property in any particular or specified way, or in any way. It may be that some influence, by means of these séances, was obtained over her, but by whom, and to what purpose, is not shown. It may be that all these Spiritualistic séances and messages were a scheme of deception and fraud, but there is no proof in the case which ought to support a judgment that such was the fact. There is enough, perhaps, to raise a suspicion, but far from sufficient to produce conviction. Circumstances raising a suspicion, but not producing conviction, ought not to jus-

tify a court in denying probate. There is no proof tending to show what influence the spirits or the mediums exercised over the testatrix in making her will, or their influence upon her generally, except, perhaps, the fear expressed by herself of being alone because of them. Such statements, of course, are competent to show her condition of mind, but not to prove undue influence against either persons or spirits. For the purpose of proving undue influence they are without the least force. The will of one who believes in Spiritism is not on that account void, nor is it evidence of mental unsoundness. It must be shown, in order to avoid a will on that account, that it was the offspring of such belief.

The contestants have urged that it is not the policy of courts to "strain" after probate of a will. While that is true, the converse of the proposition is equally true,—that courts should not strain to refuse probate. The will of the testatrix was made in 1888 and the codicil in 1894, and upon the execution of both instruments they were handed to her. Nieman went to the office of Clinton & Clark, and stated that Mrs. Rohe wanted them to prepare her will. They were the same attorneys who had transacted her husband's business, and likewise transacted business for her after her husband's death. Nieman was advised by the attorneys that he should bring to them a statement of what the testatrix desired, and a will would be prepared by them. This he did. A draft was made, and the same submitted to the testatrix. The will was then prepared as now presented, an appointment made with the testatrix, and the formalities of the execution were accomplished. Both remained in her possession until about the time of her death, thus giving her full opportunity to examine them, or to have them read to her, if she so desired. It seems hardly conceivable that the contents of the will should have been unknown to the testatrix, as has been urged by the contestants. I am impressed with the great weight which is, and should be, given to the right which the law gives to the owners of property to dispose of it by will, and the moderate capacity required for the exercise of that right, and the aid they may invoke from others in giving order and legal form to their wishes without subjecting them to the charge of fraud and undue influence. I am satisfied that the testatrix had testamentary capacity, that no undue influence or fraud was practiced upon her, that the will and codicil represent the wishes of the testatrix, and should be admitted to probate.

Decreed accordingly.